# FILED

November 17 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 09-0025

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 393

CITY OF DILLON,

      Plaintiff and Appellee,

  v.

MONTANA MUNICIPAL INSURANCE AUTHORITY,

      Defendant and Appellant.

APPEAL FROM:     District Court of the Fifth Judicial District,
In and For the County of Beaverhead, Cause No. DV 2003-12666
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Curt Drake (argued); Drake Law Firm, Helena, Montana

      For Appellee:

      Karl J. Englund (argued); Karl J. Englund, P.C., Missoula, Montana
      Thomas J. Beers (argued); Beers Law Offices, Missoula, Montana

              Argued: September 30, 2009
        Submitted: October 21, 2009
         Decided: November 17, 2009

Filed:

_____
                 Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     The Montana Municipal Insurance Authority (MMIA) appeals from the orders of the District Court of the Fifth Judicial District, Beaverhead County, granting summary judgment in favor of the City of Dillon.  We reverse.

## BACKGROUND

¶2     Marion Williams was entitled to receive a pension from the City of Dillon's Police Retirement Fund, based upon her late husband's service as the Dillon Chief of Police. She began receiving the pension benefits in 1973, and after 1980 her monthly benefit remained $480 until 2001.  Under Montana law Mrs. Williams was entitled to receive a pension payment not less than one-half of the salary paid each fiscal year to a newly confirmed Dillon police officer.  Dillon filed annual reports with the Montana State Auditor reflecting the amounts paid to beneficiaries from its Police Retirement Fund and the amount paid to a newly confirmed police officer.  The State then sent a yearly payment to Dillon in the amount of the difference in the amount of pension it paid and one-half the salary of a newly confirmed Dillon police officer.  Mrs. Williams was the only beneficiary of the Dillon Police Retirement Fund who was entitled to receive the State payment of the difference between the pension and the salary.

¶3     Despite the fact that Dillon filed the annual reports and received a payment from the State each year between 1982 and 2001, it never paid these amounts to Mrs. Williams. Dillon discovered the error in 2001 and adjusted Mrs. Williams' pension benefit amount prospectively but refused to pay her the unpaid amounts going back to

2

1982. Mrs. Williams sued Dillon to recover the pension benefits she had not been paid, plus interest. The principal amount of the unpaid pension benefits was just over $98,000, and by the time the case concluded the interest was over $107,000

¶4     MMIA is a self-insurance plan created by numerous Montana cities and towns under the Interlocal Cooperation Act, §§ 7-11-101 through -108, MCA. MMIA is governed by a Board of Directors elected by the member cities and towns. All expenses of the MMIA, including claims defense and payment, come from premium payments made by the member cities and towns. The coverage provided by MMIA is determined by coverage memoranda adopted by the Board. MMIA is not subject to the provisions of the Montana Insurance Code, § 33-1-102(9)(a), MCA. MMIA provided self-insurance coverage to Dillon.

¶5     In December, 2001, Dillon tendered defense of the Williams claim to MMIA. The tender letter from the City's attorney explained that while Dillon had received the money from the State each year since the 1970s, the City had not paid that money to Mrs. Williams. The letter stated: "To further compound the situation, our fund has been inadequately funded, and the City has used the money from the state to pay other liabilities." MMIA declined to provide coverage or defense of the Williams claim based upon an exclusion in its coverage memoranda. The relevant language excluded coverage for:

> Any liability of the Covered Party arising in whole or in part out of the covered party obtaining remuneration or financial gain to which the covered party was not legally entitled.

This is referred to as the "financial gain" exclusion.

3

¶6    MMIA applied this coverage exclusion on the ground that the City's liability to Williams arose from the City's having kept her money to which it was not legally entitled. Dillon defended itself in the Williams action, which concluded in 2005 with summary judgment in Williams' favor. The District Court in that action held that the City had a fiduciary obligation to Mrs. Williams, and that the City had converted to its own use her money and the use of that money over time. The District Court entered judgment for Mrs. Williams against the City for just over $205,000, representing the years of unpaid pension benefits plus interest and costs but not attorney fees. Dillon paid the judgment and sued MMIA to recover the judgment, interest on the judgment and defense costs.

¶7    The City and MMIA each moved for summary judgment. On April 29, 2008, the District Court entered an order construing the MMIA coverage memoranda to conclude that MMIA had no liability to the City as to the principal amount of the Williams claim; that MMIA had a duty to defend the City based upon Williams' claim for interest; and that the amount of damages remained to be determined. As to the principal amount of the Williams claim, the District Court held that it was covered by the MMIA policy, but that coverage was excluded under the "financial gain exclusion" because the principal amount due to Mrs. Williams never belonged to the City. The District Court held that "[t]here should be no payment due from the insurer when no loss has been incurred."

¶8    Using much the same analysis of the MMIA coverage memoranda, the District Court further concluded that Mrs. Williams' claim for interest was also covered under the policy. However, unlike the claim for principal, the District Court held that the financial

4

gain exclusion did not apply because there was "no financial gain resulting from exposure to pay a loss which must be funded from the City's own resources." The District Court later in the order explained that there was a potential difference "between the interest the City could or should have earned" on the Williams principal and the interest it had to pay her as a result of her lawsuit. "The possibility of this difference and potential loss existed when MMIA declined to defend the City. The facts assert a covered risk."

¶9 The District Court issued a further order in the case on October 6, 2008. This order confirmed the prior conclusion that MMIA had a duty to defend based upon Mrs. Williams' claim for interest "which potentially could result in a covered loss to the City." The District Court concluded that MMIA had breached its duty to defend and was therefore liable to Dillon for the entire amount of the Williams judgment, including the principal amount, interest, and attorney fees. On October 15, 2008, the District Court entered judgment for the City for $205,611.80 (principal and interest awarded to Williams); $29,915.21 (attorney fees for defending the Williams claim); $76,271.34 (pre-judgment on the prior amounts); and $103,932.78 (attorney fees in the action against MMIA). MMIA appeals. We reverse.

¶10 MMIA raised several issues on appeal, one of which we find dispositive: Whether MMIA had a duty to defend Dillon on the Williams claim.

## STANDARD OF REVIEW

¶11 This is an appeal from the District Court's orders granting summary judgment to Dillon. This Court reviews summary judgment rulings de novo, using the same criteria in

5

M. R. Civ. P. 56 used by the district court. *Virginia City v. Estate of Olson*, 2009 MT 3, ¶ 14, 348 Mont. 279, 201 P.3d 115. We review a district court's conclusions of law to determine whether they are correct. *State Farm Mut. Auto Ins. Co. v. Gibson*, 2007 MT 153, ¶ 9, 337 Mont. 509, 163 P.3d 387.

## DISCUSSION

¶12 While the parties addressed a number of legal issues potentially applicable to this appeal, we conclude that it may be resolved by applying the MMIA's coverage memoranda. As noted above and as found by the District Court, MMIA's obligation to Dillon is governed by the language of its coverage memoranda. The District Court held that while the Williams claim was a covered loss, the clause referred to as the "financial gain" exclusion precluded coverage. The District Court applied the "financial gain" exclusion only to Williams' claim for the principal amount of her unpaid pension benefits, but declined to apply it to Williams' claim for interest.

¶13 This approach construes and applies the "financial gain" exclusion too narrowly, and in contravention of its plain language. The exclusion, as noted above, provides that there is no coverage for "[a]ny liability" of Dillon that arises "in whole or in part" from Dillon's obtaining money that it is not entitled to. The clear and explicit language of a contract governs its interpretation, § 28-3-401, MCA, and the words are to be understood in their ordinary and popular sense, § 28-3-501, MCA. The unambiguous plain language of an insurance policy coverage exclusion is applied. *State v. Allendale Mutual Ins. Co.*, 2007 MT 83, ¶ 15, 337 Mont. 49, 154 P.3d 1233. We therefore apply the plain language of the MMIA memoranda governing exclusions from coverage.

6

¶14    It is plain that Dillon incurred liability to Mrs. Williams when it converted to its own use the money the State sent each year for her benefit. Dillon's liability for both the principal amount and interest on that amount as provided by law was established as a matter of law in the District Court's orders in Mrs. Williams' action against Dillon. Dillon's liability was also established in the District Court's April 28, 2008 order in this case, which held that Dillon had converted Mrs. Williams' pension payments *and* her right to the use of that money over time.

¶15    Mrs. Williams' claim against Dillon for the principal and the interest on the principal both arose solely from Dillon's having obtained the State money that rightfully belonged to her. The Williams principal claim and interest claim are inextricably related and both arise from and constitute conversion. An entity that converts the money of another also converts the interest--the right of the other to use the money. In the arena of credit transactions, the statutory definition of interest is "the compensation allowed by law or fixed by the parties for the use or forbearance or detention of money." Section 31-1-104, MCA. Most cases dealing with the recoverability of interest involve claims for interest allegedly due as compensation for the detention of money. In other words, the interest sought is money which the injured party hypothetically could have earned, through investment or otherwise, if the injury-causing party had timely paid compensation to them. *Martel Construction v. Department of Highways*, 249 Mont. 507, 512-13, 817 P.2d 677, 680 (1991). The use of the interest Williams "hypothetically could have earned" is a gain to Dillon and was excluded from coverage under the terms of the coverage memoranda. Therefore, MMIA had no duty to provide coverage to Dillon on

the Williams claim and could not be held liable to Dillon for the liabilities or any other losses it incurred because of its conversion of the Williams pension.

¶16    The issue in this case was not whether Dillon actually experienced a "financial gain" from interest on Williams' money. The issue was not the source of funds Dillon may have used to pay the Williams judgment. *See* § 2-9-316, MCA, providing local governments with several options for raising funds to pay judgments. The issue, under the language governing coverage, was whether the Williams claim arose in whole or in part from Dillon's unlawful retention of Williams' money. It did, and therefore Dillon had no coverage for Williams' claims for return of principal and interest.

¶17    The District Court is reversed and the judgment against MMIA is vacated.


/S/ MIKE McGRATH


We concur:

/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ BRIAN MORRIS


Justice James C. Nelson dissents.

¶18    I respectfully dissent from the Court's decision. I would affirm the District Court.

¶19    Contrary to the Court's characterization of the issue in ¶ 16 of the Opinion, the actual ruling of the District Court in its April 29, 2008 summary judgment order was that since there was no unequivocal demonstration that Dillon had earned as much interest as

8

it had to pay to Williams, the claim for interest was a potential loss and MMIA had a duty to defend.

¶20 The trial court was correct. Because MMIA and Dillon both sought summary judgment, neither asserted that Dillon had, in fact, earned interest on Williams' pension benefits (and, if so, in what amount). Accordingly, in his April 29, 2009 summary judgment order, the trial judge held that if the difference between the interest Dillon could or should have earned during the time it wrongfully retained Williams' benefits was less than the interest paid to Williams, "then there is a loss." The District Court held that the possibility that Dillon had not earned as much interest as it had to pay Williams was sufficient to trigger MMIA's duty to defend—in the absence of an unequivocal demonstration that the claim against Dillon did not fall within the coverage memorandum. In my view, that is really all this case is about—MMIA's refusal to defend Dillon and the consequences of that refusal.

¶21 At bottom, MMIA's contract with Dillon is, undisputedly, an indemnity agreement. As defined by § 28-11-301, MCA, an indemnity contract is one "by which one engages to save another from a legal consequence of the conduct of one of the parties or of some other person." Under § 28-11-316, MCA, "[t]he person indemnifying [here MMIA] is bound, on request of the person indemnified [Dillon], to defend actions or proceedings brought against [Dillon] in respect to the matters embraced by the indemnity . . . ." Moreover, this statute also provides that "[i]f, after request [for indemnification], [MMIA] neglects to defend [Dillon], a recovery against [Dillon] suffered by [Dillon] in good faith is conclusive in favor of [Dillon] against [MMIA]." So

9

long as there was a "potential loss" to Dillon, as the District Court ruled, then MMIA's statutory duty to defend existed. When MMIA twice summarily refused to defend, it did so at its peril. Section 28-11-316, MCA.

¶22 The Court's decision that Dillon had no coverage for this potential loss, contradicts MMIA's concessions at the summary judgment proceeding in August 2008. At that hearing, MMIA asserted that there should be a hearing to determine the actual amount of "lost interest to the City"—thus conceding the "potential loss" found by the trial judge. More importantly, MMIA conceded that this potential loss was covered and that "[i]f it exists, it should be paid." The Court's decision here—that there was no coverage for any loss suffered by Dillon as a result of the Williams' judgment—flies in the face of MMIA's own statements in the District Court that portions of the Williams' judgment were, in fact, covered under its agreement with Dillon.

¶23 MMIA's duty to defend—and, again that is all this case is about—arose, as a matter of law, because when Dillon tendered defense of the Williams' case, there had been no unequivocal demonstration that that part of William's claim for interest on the past-due pension benefits was excluded from coverage. Even MMIA admitted that. It argued for a hearing to determine Dillon's loss, after maintaining that it should not have to pay the entire Williams' judgment against Dillon since the potential loss on interest might be *de minimis*.

¶24 MMIA acknowledged in the trial court that our rule in *Farmers Union Mut. Ins. Co. v. Staples*, 2004 MT 108, 321 Mont. 99, 90 P.3d 381, controlled—i.e., "[u]nless there exists an unequivocal demonstration that the claim against an insured does not fall within

10

the insurance policy's coverage, an insurer has a duty to defend," *Staples*, ¶ 22, and the insurer is liable for the amount of the total judgment against the insured in the underlying case, *Staples*, ¶ 20. Because MMIA twice summarily rejected Dillon's tender of defense when there was a potential covered loss, MMIA must now bear the consequences of its conduct under *Staples*. MMIA should be held liable to Dillon for the entire Williams' judgment. *Staples* demands that result.

¶25 As this case was argued in the court below, the District Court's decision, Opinion, ¶ 7, was correct and should be affirmed. I respectfully dissent from our contrary decision here.

/S/ JAMES C. NELSON

Justice Patricia O. Cotter joins the Dissent of Justice James C. Nelson.

/S/ PATRICIA O. COTTER